IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| STATE FARM MUTUAL AUTOMOBILE | : | CIVIL ACTION |
| INSURANCE COMPANY, et al. | : | |
| | : | |
| v. | : | |
| | : | |
| DARREN S. LUGIANO, et al. | : | NO. 15-575 |

ORDER

AND NOW, this 14th day of June 2016, upon consideration of Plaintiffs' Motion to

Dismiss the Lugiano Entities' Amended Counterclaim (Doc. No. 31), Defendants' response in

opposition (Doc. No. 33), Plaintiffs' Reply Memorandum in support of motion to dismiss (Doc.

No. 37), and Defendants' Sur-Reply in opposition (Doc. No. 38), it is hereby ORDERED that

Plaintiffs' motion to dismiss (Doc. No. 31) is GRANTED in part, DENIED in part. Counts I, II,

III, and VI are DISMISSED from Defendants' amended counterclaim (Doc. No. 20).

I.      Background

Plaintiffs State Farm Mutual Automobile Insurance Company and State Farm Fire and

Casualty Company (hereinafter "State Farm") filed this action on February 5, 2015, alleging that

Defendants, [1] chiropractic and medical services providers, have engaged in a scheme to defraud

State Farm through the submission of fraudulent insurance claims. Compl. ¶ 1, Doc. No. 1. State

Farm's complaint alleges, inter alia, that: Defendants created and submitted false and fabricated

medical and chiropractic records; provided unreasonable and unnecessary treatment; recorded

treatment in the medical records which was not provided as identified or not provided or

dispensed to patients; placed patients on standardized and pre-determined treatment plans; billed

---

[1] Specifically: Woodland Avenue Medical Center, P.C.; DTL Enterprises, P.C. d/b/a South Philadelphia Pain
Center; Butler Street Medical Center, P.C.; Lebanon Avenue Medical Center, P.C.; and Darren Lugiano, D.C., who
is a licensed chiropractor and proprietor, owner, officer, employee, agent, and shareholder of the previously listed
entities (together the "Lugiano entities").

examinations at an excessive rate; and created reports listing false medical conditions to support uninsured, underinsured and bodily injury claims brought by patients. See Compl. ¶¶ 12-24. Based on these allegations, State Farm's original complaint asserts claims for common law fraud (Count I), violations of the Pennsylvania Insurance Fraud statute (Count II), unjust enrichment (Count III), and restitution for mistaken insurance reimbursement payments (Count IV). Compl. ¶¶ 44-72.[2]

On April 17, 2015, Defendants filed an answer denying State Farm's allegations, along with a counterclaim. Doc. No. 13. On May 21, 2015, Defendants filed an amended counterclaim. Am. Countercl., Doc. No. 20. In the amended counterclaim, Defendants briefly describe the history of State Farm, focusing on the period when Ed Rust, Jr. took over the company in 1985. Am. Countercl. ¶¶ 1-5. In particular, they describe the events occurring at the 1986 Division Claims Superintendents Conference, where State Farm allegedly adopted a new philosophy on claims handling. Am. Countercl. ¶¶ 5-32. This philosophy is described as focused on minimizing claims payments by pursuing a "mad dog" defense tactic, whereby, among other tactics, denials of claims are supported by attacks on medical providers. Am. Countercl. ¶¶ 10-32. State Farm allegedly institutionalized this strategy, named "Advancing Claims Excellence" or "ACE," and has been implementing it ever since in a variety of forms. Am. Countercl. ¶¶ 32-33.

According to Defendants, one aspect of State Farm's strategy is to go after "build up claims" which occur when a personal injury plaintiff incurs a disproportionate amount of medical bills in an attempt to increase the value of his or her claim. Am. Countercl. ¶¶ 15-16. State Farm's idea of a "build up" case is one in which the doctor, lawyer, and claimant are conspiring to create the appearance of worse injury and damages, i.e., commit fraud. Am. Countercl. ¶ 50. Defendants allege that one facet of State Farm's model is to manufacture a false

---

[2] State Farm filed a motion to amend their complaint, which this Court denied on April 26, 2016. Doc. No. 82.

perception of "build up" cases as a means to devalue claims. Am. Countercl. ¶¶ 33-34. Defendants also aver that McKinsey & Company helped devise State Farm's basic strategy by advising them to develop processes aimed at paying less in claims, resulting in higher profits. Am. Countercl. ¶¶ 35-37. McKinsey identified claims involving "soft-tissue injuries" as presenting the greatest opportunity to reduce insurance costs. Am. Countercl. ¶ 40. State Farm, according to Defendants, receives 30,000 claims a day, 90% of which include "soft-tissue injuries." Am. Countercl. ¶¶ 42-43. In "minor impact" accidents, State Farm developed "Minor Impact Soft Tissue" or "MIST" protocols, which Defendants allege are designed to build the perception of those claims as "build up" cases—the key to which is to attack the credibility of the treating doctor. Am. Countercl. ¶¶ 44-45. In Pennsylvania, State Farm allegedly developed a list of 'fraud indicators" to deal with MIST cases. Am. Countercl. ¶ 51. Indicators include being represented by an attorney or seeking treatment from a chiropractor. Am. Countercl. ¶¶ 52-53. Defendants claim that these manufactured "fraud indicators" can be found in virtually every new claim submitted. Am. Countercl. ¶ 54.

State Farm's policies allegedly led to a large influx of fraud cases, requiring increased staff in State Farm's Special Investigations Unit ("SIU"). Am. Countercl. ¶¶ 55-56. It also required that State Farm partner with specific law firms to work towards manufacturing the perception of fraud. Am. Countercl. ¶¶ 56-57. Defendants allege that, beginning in the late 1990s and continuing through today, State Farm has funneled these law firms thousands of cases with instructions to use "mad dog" defense tactics and manufacture the perception of "build up" cases. Am. Countercl. ¶ 61. The purpose of this collaboration was to alert those making claims, doctors providing treatment, and lawyers representing claimants that State Farm would attack them with accusations of fraud. Am. Countercl. ¶ 62. Once a doctor is targeted, SIU or MCIU

(Multi-Claim Investigation Unit) creates a "project" identifying the provider and assigns a SIU representative. Am. Countercl. ¶ 66. That representative is used to handle all third party cases, including uninsured and underinsured motorist ("UM" and "UIM," respectively) claims. Am. Countercl. ¶ 68. One of the partner law firms is then assigned to all of the claims involving the targeted provider, and the litigation is used as a covert "shadow discovery" opportunity to gain information on that provider. Am. Countercl. ¶ 69, 75. Defendant alleges that this arrangement "illicitly incentivizes the law firm" to manufacture evidence in the hopes of convincing State Farm that a lawsuit against the provider should be filed, and the firm should be paid millions in fees to prosecute it. Am. Countercl. ¶ 71.

Defendant states that this lawsuit is an extension of the above "mercenary" tactics, and like the rest, is designed to destroy the reputation of a medical provider, eliminating the source of the claim expense entirely, while terrorizing the medical and legal communities from assisting those who are injured. Am. Countercl. ¶ 77. In other words, this lawsuit, and others that State Farm has filed, are not about fraud. Am. Countercl. ¶ 78. If they were, Defendants contend that State Farm's protocols require it to report suspected fraud to the National Insurance Crime Bureau ("NICB"), a private organization that acts as a liaison between insurers and law enforcement. Am. Countercl. ¶¶ 79-82. In this case, Defendants maintain that no referral has been made to the NICB, which they argue illustrates that State Farm has no interest in stopping the alleged fraud and instead seeks only to stop Defendants from supporting patient claims and billing State Farm. Am. Countercl. ¶¶ 84-85.

Defendant's complaint also describes the dominance of State Farm in the insurance market. According to Defendants, three out of every five cars on the road today are insured by State Farm. Am. Countercl. ¶ 86. In Pennsylvania, State Farm has a 19.4% market share, with

$1.4 billion in direct written premiums. Am. Countercl. ¶ 87. That is more than Nationwide and Progressive combined, and 6% more than its nearest competitor. Am. Countercl. ¶ 87. State Farm allegedly uses this market position to intimidate and coerce doctors into providing less treatment and submitting less billing. Am. Countercl. ¶ 89.

Further, when State Farm files a lawsuit, according to the Defendants' counterclaim, it stops all payments being made to the doctor through the issuance of a "TIN block" which prevents State Farm's system from issuing any check to the tax identification number of the sued doctor. Am. Countercl. ¶ 90. Once in place, State Farm sends letters to patients and/or their attorneys stating that payment was denied because State Farm is in litigation with that entity. Am. Countercl. ¶ 91. Defendants allege that these letters are designed to direct people to the lawsuit's allegations and destroy the reputation of the doctor. Am. Countercl. ¶ 92. In this case, State Farm sent out such a letter (Ex. A to the Am. Countercl.), denying payment for the bills because they "are at issue in civil litigation between State Farm" and the Lugiano entity where the patient was treated. Am. Countercl. ¶ 98. According to Defendants, a google search for "State Farm litigation Lugiano" reveals multiple websites identifying the lawsuit as alleging fraud. Am. Countercl. ¶ 99. The Defendants maintain that there is no reason to reference the litigation in the letters, and that the alleged fraud in this case is knowingly and maliciously false. Am. Countercl. ¶¶ 100-102. Due to the dissemination of these false accusations, Defendants allege that Dr. Darren Lugiano has suffered grave damages to his reputation. Am. Countercl. ¶ 104. Further, because of the concerted and combined efforts of State Farm, the identified law firms, and the NICB, Defendants state that the Lugiano entities and countless other medical providers in Philadelphia "and across the country have been restrained in their trade by coercion and

intimidation and have suffered and will continue to suffer substantial lost revenues." Am. Countercl. ¶ 105.

As a result of the above, Defendants assert claims against State Farm for antitrust violations (Count I), defamation (Count II), commercial disparagement (Count III), tortious interference with existing and prospective economic relations (Count IV), abuse of civil process (Count V), and civil conspiracy (Count VI). Am. Countercl. ¶¶ 106-151.

On June 19, 2015, Plaintiffs filed a motion to dismiss Defendants' amended counterclaim for failure to state a claim upon which relief can be granted. Doc. 31. Defendants filed a response, Doc. No. 33, Plaintiffs replied, Doc. No. 37, and Defendants filed a sur-reply, Doc. No. 38. On January 20, 2016, this case was reassigned from the Honorable L. Felipe Restrepo to the undersigned. See Doc. No. 65.

Plaintiffs' motion is now ripe for our review.

II.    Standard of Review

Dismissal for failure to state a claim is proper if "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 558 (2007). When considering a Rule 12(b)(6) motion to dismiss, courts must accept the complaint's factual allegations as true and interpret them in the light most favorable to the [complainant], drawing all inferences in the [complainant's] favor, PG Publ'g Co. v. Aichele, 705 F.3d 91, 97 (3d Cir. 2013), but should "disregard rote recitals of the elements of a cause of action, legal conclusions, and mere conclusory statements," James v. City of Wilkes Barre, 700 F.3d 675, 679 (3d Cir. 2012). "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009). These allegations need not be detailed but

"must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555. Therefore, "only a complaint that states a plausible claim for relief survives a motion to dismiss." Iqbal, 556 U.S. at 679.

In conducting the above analysis, the court is limited to "allegations contained in the complaint, exhibits attached to the complaint and matters of public record." Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993) (citing 5A Charles Allen Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 (2d ed. 1990)). The court may not rely on other parts of the record in determining a motion to dismiss. See Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1261 (3d Cir. 1994). In other words, "district courts are generally barred from considering matters outside of the complaint when ruling on a 12(b)(6) motion." Vullings v. Trans Union, LLC, No. 15-2814, 2015 WL 4130784, at *1 (E.D. Pa. July 9, 2015) (quoting Cerome v. Moshannon Valley Corr. Ctr./Cornell Cos., Inc., No. 09-2070, 2010 WL 4948940, at *3 (3d Cir. Dec. 7, 2010)) (internal quotation marks and brackets omitted).

III. Discussion

a. Sherman Antitrust Act § 1

Defendants' counterclaim alleges that State Farm violated the Sherman Act by conspiring with law firms to manufacture lawsuits that create the perception of wrongdoing by medical providers in order to intimidate the marketplace of providers into providing less care. Defs.' Resp. to Mot. Dismiss 4, 6, Doc. No. 33. Section 1 of the Sherman Act declares that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States" is illegal, and that "[e]very person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be

deemed guilty." 15 U.S.C. § 1. In enacting Section 1, Congress singled out "concerted behavior" due to its anticompetitive risk. See Copperweld Corp. v. Indep. Tube Corp., 467 U.S. 752, 768 (1984). As the Supreme Court recognized, concerted behavior wherein "two or more entities that previously pursued their own interests separately are combining to act as one" can "deprive[] the marketplace of the independent centers of decisionmaking that competition assumes and demands . . . [which] not only reduces the diverse directions in which economic power is aimed but suddenly increases the economic power moving in one particular direction." Id. at 768-69.

A person asserting a Section 1 claim must allege four elements: "(1) concerted action by the defendants; [(2)] that produced anti-competitive effects within the relevant product and geographic markets; (3) that the concerted actions were illegal; and (4) that it was injured as a proximate result of the concerted action." Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc., 602 F.3d 237, 253 (3d Cir. 2010) (quoting Gordon v. Lewistown Hosp., 423 F.3d 184, 207 (3d Cir.2005)). As to the first requirement, Section 1 claims are "limited to combinations, contracts, and conspiracies, and thus always require the existence of an agreement." Howard Hess, 602 F.3d at 254. To allege such an agreement between two or more persons or entities, a complainant must allege facts plausibly suggesting "a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement." Id. at 254 (quoting Copperweld, 467 U.S. at 771). Unilateral action does not violate Section 1. Edward J. Sweeney & Sons, Inc. v. Texaco, Inc., 637 F.2d 105, 110 (3d Cir. 1980); In re Chocolate Confectionary Antitrust Litig., 801 F.3d 383, 396 (3d Cir. 2015) ("[Section] 1 liability cannot be predicated on a defendant's unilateral actions, no matter its anticompetitive motivations."). Rather, concerted action requires proof "that two or more distinct entities agreed to take action." Siegel Transfer, Inc. v. Carrier Exp., Inc., 54 F.3d 1125, 1131 (3d Cir. 1995).

Defendants argue that State Farm and the law firms it hires formed a conspiracy. Defs.' Resp. to Mot. Dismiss 4. The attorney client relationship "is a quintessential principal-agent relationship." C.I.R. v. Banks, 543 U.S. 426, 436 (2005) (quoting Restatement (Second) of Agency § 1, Comment *e* (1957)). "A corporation cannot conspire with itself . . . and it is the general rule that the acts of the agent are the acts of the corporation." Johnston v. Baker, 445 F.2d 424, 427 (3d Cir. 1971) (citation omitted). A principal-agent relationship cannot establish liability under Section One, unless "[1] an agent acts to further his own economic interest . . . and [2] causes his principal to take the anticompetitive actions about which the plaintiff complains." Siegel, 54 F.3d at 1136-37.

Plaintiff contends that Defendants' counterclaim does not support an inference that State Farm's law firms acted to further their own economic interest or caused the anticompetitive behavior, and thus Defendants have failed to state a conspiracy claim. Pls.' Reply Mem. Supp. Mot. Dismiss. 1-2, Doc. No. 37. Defendants disagree, and point to their allegations that law firms were incentivized to manufacture evidence to convince State Farm to file a lawsuit, for which they would be paid handsomely. Defs.' Resp. to Mot. Dismiss 6-7, Doc. No. 33. They also argue that their complaint exhaustively details how State Farm "deploys law firms to 'manufacture the false perception of 'build up cases' (¶34) in order to attack doctors with 'manufactured accusations of fraud' (¶65) for a 'lawsuit the SIU wants to manufacture' (¶69)." Defs.' Sur-Reply 1, Doc. No. 38. Plaintiffs, however, characterize these allegations as relating to bad incentives, which does not support the claim that the firms were acting in their own interest, rather than at the direction of State Farm. Pls.' Reply Mem. Supp. Mot. Dismiss. 2.

The Court agrees with the Plaintiffs. The alleged agreement between the firm and State Farm does not raise a plausible inference that the law firms caused the supposed anticompetitive

behavior, or benefited from it in a way giving rise to an antitrust violation. Defendants'

counterclaim describes how State Farm concocted the alleged scheme, and the various ways they

have implemented it over the years. Am. Countercl. ¶¶ 1-56. The inference drawn from

Defendants' counterclaim is that the law firms worked at State Farm's direction. See, e.g., Am.

Countercl. ¶ 61 ("State Farm has funneled to these law firms the defense of thousands of . . .

cases with instruction to utilize 'the old mad dog defense tactics.'"); ¶ 65 ("State Farm also

deployed these law firms directly against medical providers."); ¶ 66 ("[I]n combination with the

law firms . . . State Farm has directly attacked scores of doctors"). The only portion of the

counterclaim that supports an active co-conspirator role for the law firms is the allegation that

the conspiracy "illicitly incentivizes the law firm to cherry-pick and manufacture evidence which

they can use to convince State Farm that the hoped for lawsuit against the provider should be

filed and that the law firm should be paid millions of dollars in fees to prosecute it." Am.

Countercl. ¶ 71. However, even with all inferences being drawn in favor of Defendants, this

allegation does not support the idea that the law firms *caused* the anticompetitive behavior;

instead, it at most supports an inference that the law firms advised State Farm to file a law suit

only after State Farm had already requested the firm's involvement. See Siegel, 54 F.3d at 1137

("[The] giving of advice . . . when requested by the decision maker, is not equivalent to making

the decision.").

Furthermore, the law firms do not benefit from the anticompetitive aspect of the alleged

conspiracy. In Siegel, the Third Circuit narrowly interpreted the agency exception to

conspiratorial liability such that it would only apply where the agent had "at least an economic

stake in the gain to be realized from the anticompetitive object of the conspiracy." 54 F.3d at

1136 (quoting Pink Supply Corp. v. Hiebert, Inc., 788 F.2d 1313, 1318 (8th Cir. 1986)). Even

before Siegel, however, this limited interpretation was present in the case law. For example, in

Ashley Meadows Farm, Inc. v. American Horse Shows Ass'n, Inc., the district court granted a

motion to dismiss a Sherman Act Section 1 claim against a horse show association and its

counsel for conspiring to restrain the horse show market. No. 82 CIV. 5691 (RWS), 1983 WL

1882 (S.D.N.Y. Sept. 29, 1983). The court found that allegations that the counsel was a member

of the horse association, utilized the law to further the association's allegedly illegal goals, and,

in general, zealously advocated and advised the association, were insufficient to show that

counsel was an independent co-conspirator. Id. at *4. The court reasoned, citing Poller v.

Columbia Broadcasting System, Inc., 368 U.S. 464, 470 (1962), that although the attorney

belonged to the horse association, he did not have a personal stake in the success of the object of

the conspiracy—which was to restrain the horse show market. Id. at *3-4 ("Plaintiff categorizes

[the attorney's] membership merely as giving rise to a 'natural inclination' toward the alleged

conspirators, and makes no allegation that [the attorney] has a pecuniary or other tangible

interest in the purported scheme."). The same is true in this case. While the law firm has a

natural interest in prosecuting State Farm's cases and receiving fees, it has no tangible interest in

the ultimate goal of the anti-competitive scheme—which is to restrain the number and amount of

insurance claims made against State Farm. See Gen. Refractories Co. v. Fireman's Fund Ins. Co.,

337 F.3d 297, 313-14 (3d Cir. 2003) ("The fact that attorneys may have 'mixed motives,' . . .

does not remove their conduct from the scope of the agency.'" (quoting Heffernan, 189 F.3d at

413)). Further, this alleged agreement does not bring together the "economic power of actors

which were previously pursuing divergent interests and goals," for which Section 1 was designed

to oversee. Siegel, 54 F.3d at 1137. Rather, the law firms are pursuing the same interests they

were designed to pursue within the scope of their agency relationship: the will of their clients and

the profit deriving from those services. Thus, defendants' counterclaim fails to allege concerted action on the part of State Farm that would implicate the Sherman Antitrust Act. As such, there is no need to consider the other Sherman Act factors, as liability under Section 1 cannot be predicated on unilateral behavior. Therefore, Count 1 must be dismissed.

b.     UIPA

State Farm argues that the Pennsylvania Unfair Insurance Practices Act ("UIPA") defeats Counts II, III, and IV of Defendants' counterclaims. UIPA provides that "[t]here shall be no liability on the part of and no cause of action of any nature shall arise against . . . any insurer . . . for any statement made by them in *complying* with this act or for providing information pertaining thereto." 40 Pa. Stat. Ann. § 1171.6 (emphasis added). Under UIPA, State Farm must "promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement." 40 Pa. Stat. Ann. § 1171.5(a)(10)(xiv). At issue in Counts II, III, and IV are the insurance coverage denial letters State Farm sent to those who received treatment by the Lugiano entities after the initiation of this litigation.

State Farm argues that it was obligated to notify the affected insureds why their coverage was being denied and cites DeMoss v. Metro. Life Insurance Co., 586 F. Supp. 1571 (W.D. Pa. 1984), aff'd, 760 F.2d 256 (3d Cir. 1985), for the proposition that an insurer is immune, as a matter of law, from tort liability arising from such UIPA-required notifications. Pls.' Mot. Dismiss 18-20. They also contend that such immunity extends to even defamatory communications. See Pls.' Mot. Dismiss 25; Pls.' Reply Mem. Supp. Mot. Dismiss 4 (citing Pino v. Prudential Ins. Co. of Am., 689 F. Supp. 1358 (E.D. Pa. 1988)). Defendants counter that the letters State Farm sent are not entitled to immunity because they violate UIPA and contain

information that is unnecessary and false. Defs.' Resp. to Mot. Dismiss 11-12 ("[T]he immunity conferred [by UIPA] is <u>limited</u> to statements made '*in complying with this act*'" (quoting 40 Pa. Stat. Ann. § 1171.6)). Defendants state that the denial letters, under UIPA, contain representations related to insurance that are untrue, deceptive, and misleading in violation of several provisions of the act. Defs.' Resp. to Mot. Dismiss 12 (citing 40 Pa. Stat. Ann. § 1171.5(a)(2)-(4)). Further, they argue that the letters are maliciously false and critical, and are part and parcel of State Farm's concerted action to restrain trade. Defs.' Resp. to Mot. Dismiss 12.

As an initial matter, the Court disagrees with Plaintiffs' reading of <u>Pino v. Prudential Insurance Company of America</u>. In <u>Pino</u>, an insurance broker brought an action against an insurer for defamation based on an allegedly libelous letter that the insurer's agent wrote to the Pennsylvania Insurance Commission and professional organizations of insurance agents. <u>Pino</u>, 689 F. Supp. at 1366. The <u>Pino</u> court found that the letter, which criticized the insurance broker's actions as violating UIPA, was capable of a defamatory meaning, yet contained essentially accurate facts. <u>Id.</u> at 1367. Without deciding whether UIPA protects completely false allegations of insurance misconduct, the court held that the letter to the insurance commissioner was entitled to complete immunity, while the letter sent to the professional organizations was only conditionally privileged. <u>Id.</u> at 1367-68. The court based this decision, in part, on the role that the insurance commissioner plays in the enforcement of UIPA and the importance of encouraging reports of misconduct. <u>Id.</u> at. 1367-69. The <u>Pino</u> court, therefore, did not rule that all letters sent pursuant to the UIPA guidelines, no matter how defamatory, are entitled to immunity.

In this case, the letters at issue were sent to those insured by State Farm. While UIPA requires insurers denying coverage to provide an explanation, these letters do not serve the same

public policy goal as letters reporting insurance misconduct to the insurance commissioner. In reporting misconduct, the public interest militates in favor of allowing a broad range of speech so as not to chill the reporting of bad practices. See Pino, 689 F. Supp. at 1367. By contrast, the public interest in informing insureds the reasons why their claims have been denied does not extend to exaggerated, hyperbolic, or potentially defamatory speech. Instead, the aim of UIPA in this context is to provide a reasonable explanation, under the law, for a denial of insurance coverage. Letters that offer a false reason or beyond a reasonable explanation may run afoul of the UIPA's compliance requirement, and thus be beyond UIPA's protection. This interpretation is in harmony with DeMoss, where the court found that a denial letter providing a "prompt, reasonable explanation of the basis upon which [the insurer] denied coverage"—in other words, was in compliance with UIPA—satisfied the company's obligations under UIPA and entitled them to immunity. 586 F. Supp. at 1573.

Here, the threshold question is whether the information in the denial letters goes beyond what is required under UIPA, such that State Farm could be liable in tort for its contents. The example letter provided by Defendants states, in relevant part, that:

> "The bills submitted by Woodland Avenue Medical Center are at issue in civil litigation between State Farm and Woodland Avenue Medical Center. Therefore, the claim for payment of bills submitted by Woodland Avenue Medical Center relating to treatment to [redacted] with respect to this claim and date of loss are denied at this time."

Ex. A. to Am. Countercl.[3] Defendants argue that referencing pending litigation as the basis for the denial of the claim was unnecessary and false. They also argue that denial letters run afoul of various UIPA sections. Defs.' Resp. to Mot. Dismiss 12 (citing 40 Pa. Stat. Ann. § 1171.5(a)(2)-

---

[3] State Farm contends that the letter attached to Defendants' counterclaim is not the letter sent to State Farm's insureds. Pls.'Mot. Dismiss 22 n. 9. Attached to State Farm's motion to dismiss is a copy of a letter it contends is the letter sent to the attorneys of the insureds in this matter. Ex. B. to Pls.' Mot. Dismiss. State Farm also appears to contest Defendants' claim that letters were sent directly to insureds, and that such letters were identical to those sent to attorneys for the insured. See Ex. C. to Pls.' Mot. Dismiss. On a motion to dismiss, the Court treats the facts asserted by the non-moving party as true. The Court will consider the letter attached to Defendants' counterclaim as the applicable document.

(4)). State Farm contends that the stated reason—civil litigation—was the reasonable basis, under UIPA, for the denial of payment. Pls.'Mot. Dismiss 18. However, the unpaid bills, which are the subject of the letters, are not at issue in this litigation and were not at issue at the time when at least some portion of the letters were sent.[4] Further, taking the facts alleged in the complaint as true, the referenced litigation was not the underlying reason that State Farm was denying the bills submitted by the Lugiano entities—and thus whether State Farm's letters are in compliance with UIPA is questionable. At this stage of the litigation, and drawing all inferences in favor of the Defendants, the Court will not hold that UIPA provides absolute immunity for the denial letters in this case.[5]

    c.    Litigation Privilege

State Farm argues that Pennsylvania's common law absolute litigation privilege defeats Counts II, III, and IV. "Under Pennsylvania law, communications pertinent to any stage of a judicial proceeding are generally accorded an absolute privilege." Bennett v. Itochu Int'l, Inc., 682 F. Supp. 2d 469, 476-77 (E.D. Pa. 2010); Richmond v. McHale, 35 A.3d 779, 784-85 (Pa. Super. Ct. 2012). "The judicial privilege serves an essential function in guaranteeing access to the courts and permitting the free articulation and resolution of legal claims." Schanne v. Addis, 121 A.3d 942, 947 (Pa. 2015). In order to be entitled to immunity, a communication must be "issued in the regular course of judicial proceedings and [be] pertinent and material to the redress or relief sought." Bochetto v. Gibson, 860 A.2d 67, 71 (Pa. 2004) (emphasis omitted). The

---

[4] This Court's Order denying State Farm's motion to amend its complaint (Doc. No. 82) confirmed that allegations related to unpaid bills are not a part of the instant litigation. Those bills may have subsequently become at issue in state court litigation.

[5] The Court need not address Defendants' further arguments related to whether immunity under UIPA applies in a situation where an insurer violates UIPA in other aspects of its behavior, as well as the larger argument that actions taken in furtherance of an illegal conspiracy or scheme should not be entitled to immunity. While there is intuitive appeal to Defendants' arguments, they have not cited any case law in support of them. That said, Defendants' more expansive argument— related to whether immunity is appropriate where an illegal scheme is alleged—has some support in the case law. See Gen. Refractories Co., 337 F.3d at 312 (discussing unavailability of litigation privilege defense in cases alleging wrongful use of civil proceedings).

privilege can "cover[] statements by a party, a witness, an attorney, or a judge." Schanne, 121 A.3d at 947. Where it attaches, the privilege is absolute, "meaning that, where it attaches, the declarant's intent is immaterial even if the statement is false and made with malice." Id. The party asserting this privilege "bears the burden of showing the privileged nature of the communication." Bennett, 682 F. Supp. 2d at 476; see 42 Pa. Cons. Stat. Ann. § 8343(b).

Here, taking the facts stated by Defendants as true, the letters at issue were sent by a State Farm claim processor to patients of Defendants. The letters are not pleadings and were not sent as a formal component of any legal proceedings. The posture of the letters is similar to that in Post v. Mendel, a leading case on judicial privilege, in which the Pennsylvania Supreme Court held that an extra-judicial letter, issued during the course of trial, was not protected by the privilege. 507 A.2d 351 (1986). In coming to this conclusion, the Post court reviewed the history and justifications of the privilege, and determined that "only . . . those communications which are issued *in the regular course of judicial proceedings* and which are *pertinent and material to the redress or relief sought*" are traditionally protected by the privilege. Id. at 355 (emphasis in original). The court determined that the letter, written by counsel for the defendant, which disparaged plaintiff's counsel and was sent to the judge in the underlying case, the Pennsylvania disciplinary board, and a client of the plaintiff, did not satisfy that standard. Id. at 355-56. The court found that although the letter referenced the proceedings, it was not directly relevant to them. Id. at 356. Specifically, the court reasoned that the letter was clearly not a part of the judicial proceedings because it was not addressed to the judge, "did not state or argue any legal position, . . . did not request any ruling or action by the court[,] [n]or . . . request that anything contained in it should even be considered by the court." Id. The same is true of the letters here; while they bear a relationship to the lawsuit between the parties, they have no actual connection

to the legal proceedings.

State Farm points to <u>Bennett</u>, 682 F. Supp. 2d 469, as a factually analogous case that illustrates why the letters should be privileged. In <u>Bennett</u>, the defendant wrote a letter accusing the plaintiff of fraudulently misrepresenting himself as an agent of defendant. <u>Id.</u> at 475. At the time the letter was sent, there was no litigation between the parties, but they were all defendants or contemplated defendants in ongoing proceedings in which a key issue was whether the plaintiff was an advisor to defendant. <u>Id.</u> at 477. The court determined that the letter was written in the course of proceedings, or in anticipation thereof, and was protected by the litigation privilege. <u>Id.</u> However, the letters in <u>Bennett</u> are distinguishable from those here. As an initial matter, these letters were not sent in preparation for trial or to articulate issues relevant to the matters that could arise in litigation; rather, they were required under Pennsylvania law in order to notify insureds that their claims were being denied. Moreover, the letters lack substantive content that implicates the purposes of the privilege, which is to protect the "realm of communication essential to the exploration of legal claims." <u>Post</u>, 507 A.2d at 355.

As such, the Court declines to find that Counts II, III, and IV are barred by the litigation privilege.

d.      Count II

State Farm argues that Defendants have failed to state a defamation claim. In a defamation action, the party alleging defamation has the burden of proving:

> (1) The defamatory character of the communication. (2) Its publication by the defendant. (3) Its application to the plaintiff. (4) The understanding by the recipient of its defamatory meaning. (5) The understanding by the recipient of it as intended to be applied to the plaintiff. (6) Special harm resulting to the plaintiff from its publication. (7) Abuse of a conditionally privileged occasion.

42 Pa. Stat. and Cons. Stat. Ann. § 8343; see also Moore v. Cobb-Nettleton, 889 A.2d 1262, 1267 (Pa. Super. Ct. 2005). Courts must determine, in the first instance, "whether the challenged [statement] is capable of a defamatory meaning." Tucker v. Phila. Daily News, 848 A.2d 113, 123-24 (Pa. 2004). In order to be defamatory, a statement must "tend[] so to harm the reputation of another as to lower him in the estimation of the community or to deter third parties from associating or dealing with him." Id. at 124 (quoting Birl v. Phila. Elec. Co., 167 A.2d 472, 475 (Pa. 1960)). In making this determination, the "court must view the statements in context," id. (quoting Baker v. Lafayette Coll., 532 A.2d 399, 402 (Pa. 1987)), and "consider the effect the statement would fairly produce, or the impression it would naturally engender, in the minds of the average persons among whom it is intended to circulate," Maier v. Maretti, 671 A.2d 701, 704 (Pa. Super. Ct. 1995). In other words, "[t]he touchstone in determining whether a statement is capable of defamatory meaning is how the statement would be interpreted by the average person to whom it was directed." Mzamane v. Winfrey, 693 F. Supp. 2d 442, 479 (E.D. Pa. 2010). A publication cannot be rendered defamatory "by an innuendo which puts an unfair and forced construction on the interpretation of the publication." Thomas Merton Ctr. v. Rockwell Int'l Corp., 442 A.2d 213, 217 (Pa. 1981) (quoting Sarkees v. Warner-West Corp., 37 A.2d 544, 546 (1944)). "An innuendo must be warranted, justified and supported by the publication." Id. (citing Bogash v. Elkins, 176 A.2d 677 (Pa. 1962)).

Plaintiffs contend that the claim denial letters, which form the basis of Defendants' defamation claim, contain no defamatory content. Pls.'Mot. Dismiss 24. Defendants disagree, and argue that Pennsylvania courts often interpret relatively mild statements as capable of a defamatory meaning depending on the context. Defs.' Resp. to Mot. 15-18. Both parties point to Allied Medical Associates v. State Farm Mutual Automobile Insurance Co., No. CIV.A. 08-

18

02434, 2008 WL 4771850 (E.D. Pa. Oct. 30, 2008), as supporting their contentions. In <u>Allied</u>, a plaintiff medical provider brought defamation claims against State Farm based on a series of three letters and one oral statement made during the course of State Farm's investigation of the medical provider for fraud. <u>Id.</u> The <u>Allied</u> court found that three of the four allegedly defamatory statements were capable of a defamatory meaning. <u>Id.</u> at *4-7. The court reasoned that the series of letters, sent on State Farm's SIU letterhead, as well as an oral statement made by a State Farm employee, suggested that the plaintiff was under investigation for fraud, and was being uncooperative. <u>Id.</u> However, the court found that the first letter in the series of communications, sent by a claims representative advising the recipient that their claim was under investigation, was not capable of a defamatory meaning because it contained no extraneous language and only suggested that State Farm had not yet finished its investigation process. <u>Id.</u> at *3. As part of this analysis, the court gave great weight to the combined effect that the series of communications could have on those receiving them. <u>Id.</u> at *4. Similarly, in <u>Schatzberg v. State Farm Mutual Automobile Insurance Co.</u>, 877 F. Supp. 2d 232, 243 (E.D. Pa. 2012), the court cited <u>Allied</u> in finding that a letter sent by a SIU investigator stating that a claim was under investigation, was capable of a defamatory meaning given the context that the SIU only investigates fraud. The <u>Schatzberg</u> court went on to find that a second, more mildly worded letter requesting that a patient provide a sworn statement regarding his claim for benefits, was also capable of a defamatory meaning given the series of communications that had taken place. <u>Id.</u> at 244.

By contrast, here, the defamation claim is based solely on a single letter. However, Defendants contend that the broader context surrounding the letters renders them defamatory. Defs.' Resp. to Mot. Dismiss 16. Specifically, Defendants argue that by unnecessarily referring to civil litigation in the letters, State Farm meant to direct readers to an online record of this

fraud-based lawsuit. Defs.' Resp. to Mot. Dismiss 17. In their complaint, Defendants allege that

if readers of the claim denial letters ran a google search for "State Farm litigation Lugiano,"

multiple websites come up that identify the lawsuit as alleging fraud. Compl. ¶ 99. This

argument, however, rests on the hypothetical scenario that individual third parties will conduct

an investigation into the basis for the letters. This hypothetical is further complicated by the fact

that the letters do not refer to Darren Lugiano by name, and thus to conduct the theorized google

search, further investigation would be necessary. Defendants have provided no precedent to

suggest that defamation may be found under such circumstances.

In this context, the letters are not capable of a defamatory meaning. The letters simply

state that the claims are at issue in civil litigation. The letters were not sent on SIU letterhead, do

not identify the nature of the dispute, who is suing whom, and whether there is any allegation of

business impropriety. Unlike <u>Allied</u> and <u>Shatzberg</u>, where the cumulative effect of multiple

communications rendered mildly-worded letters capable of a defamatory meaning, there are no

other communications which Defendants allege could contribute to a defamatory inference here.

As such, this single letter, devoid of any allegation or allusion to fraud, is not capable of a

defamatory meaning, and Count II must be dismissed.

     e.     Count III

State Farm argues that Defendants have failed to state a claim for commercial

disparagement (also known as trade libel). "A commercially disparaging statement—in contrast

to a defamatory statement—is one 'which is intended by its publisher to be understood or which

is reasonably understood to cast doubt upon the existence or extent of another's property in land,

chattels or intangible things, or upon their quality, . . . if the matter is so understood by its

recipient.'" <u>U.S. Healthcare, Inc. v. Blue Cross of Greater Phila.</u>, 898 F.2d 914, 924 (3d Cir.

1990). To bring a commercial disparagement claim, the complainant must prove the following elements: "(1) that the disparaging statement of fact is untrue or that the disparaging statement of opinion is incorrect; (2) that no privilege attaches to the statement; and (3) that the claimant suffers a direct pecuniary loss as a result of the disparagement." Guardian Life Ins. Co. of Am. v. Am. Guardian Life Assur. Co., 943 F. Supp. 509, 526 (E.D. Pa. 1996) abrogated on other grounds by A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc., 237 F.3d 198 (3d Cir. 2000). "Because the tort of disparagement protects against pecuniary loss, the elements of the cause of action are much more stringent than those for defamation." Zerpol Corp. v. DMP Corp., 561 F. Supp. 404, 408-09 (E.D. Pa. 1983). "Under Pennsylvania law, a plaintiff claiming commercial disparagement must plead damages with considerable specificity by setting out the names of customers lost and financial loss resulting from the tort." KDH Elec. Sys., Inc. v. Curtis Tech. Ltd., 826 F. Supp. 2d 782, 806 (E.D. Pa. 2011) (internal quotation marks and citation omitted).

Plaintiffs argue, inter alia, that Defendants have failed to plead special damages, which are required to bring a commercial disparagement claim. Pls.' Mot. Dismiss 31. Plaintiffs contend that Defendants have alleged that they lost patients and the confidence of attorneys who would refer patients to them, but have not made any specific claims sufficient to satisfy the requirement of special damages. Pls.' Mot. Dismiss 31. Defendants respond that the loss of business they have suffered due to the denial of their bills is sufficient to state a claim for commercial disparagement. Defs.' Resp. to Mot. Dismiss 20. However, as Plaintiffs point out, to make a claim for commercial disparagement, the pecuniary loss must be the result of the disparagement. See e.g., U.S. Healthcare, 898 F.2d at 924 ("In order to maintain an action for disparagement, the [complainant] must prove . . . [a] direct pecuniary loss *as the result* of the disparagement." (emphasis added)). As the Defendants have not put forth facts sufficient to show

special damages resulting from the purportedly disparaging statement, and not from the underlying dispute at issue, Defendants' claim for commercial disparagement must be dismissed.

f.      Count IV

Defendants allege that State Farm's letters and smear campaign against them constituted tortious interference with the Lugiano entities' relationship with its patients, both existing and prospective. "A tortious interference claim in Pennsylvania has the following elements: (1) the existence of a contractual, or prospective contractual relation between the complainant and a third party; (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual legal damage as a result of the defendant's conduct." Cornell Companies, Inc. v. Borough of New Morgan, 512 F. Supp. 2d 238, 270 (E.D. Pa. 2007). Courts often separate claims alleging interference with an existing contract right from those alleging an interference affecting prospective contractual relations. See Thompson Coal Co. v. Pike Coal Co., 412 A.2d 466, 470 (1979). "For prospective contracts, Plaintiffs must allege a reasonable likelihood that the relationship would have occurred but for the interference of the defendant." Volunteer Firemen's Ins. Servs., Inc. v. Fuller, No. 1:12-CV-2016, 2012 WL 6681802, at *10 (M.D. Pa. Dec. 21, 2012).

Plaintiffs argue that the Defendants have not pled any existing or potential economic relationships sufficient to state a tortious interference claim. Pls.' Mot. Dismiss 32. Defendants respond that they have pled a contractual relationship with their patients, who are insured by State Farm. Defs.' Resp. to Mot. Dismiss 20. Defendants argue that their counterclaim identified State Farm insureds whose bills have been denied as the contractual parties who State Farm has interfered with and continues to interfere with. Defs.' Resp. to Mot. Dismiss 20-21.

The Court agrees with the Defendants. The counterclaim contains factual averments that sufficiently identify the specific persons who were allegedly interfered with. Furthermore, Defendants have sufficiently pled, and Plaintiffs have not challenged, the remaining requirements to state a claim for tortious interference.

However, the Defendants have not stated facts sufficient to plead interference with prospective contractual relations. "The Pennsylvania Supreme Court has defined prospective contractual relation as something less than a contractual right, something more than a mere hope." U.S. Healthcare, Inc., 898 F.2d at 925 (internal quotation marks and citation omitted). A moving party's pleadings "must identify specific business relationships suffering as a result of the defendant's interference." Applied Tech. Int'l, Ltd. v. Goldstein, No. CIV.A. 03-848, 2004 WL 2360388, at *6 (E.D. Pa. Oct. 20, 2004). Here, Defendants' complaint includes no specific allegations of prospective business relationships that suffered as a result of Plaintiffs' conduct. Thus, they have failed to allege a reasonable probability they would have entered into a relationship with a specific third party.

Insofar as Count IV alleges a claim for tortious interference with existing contractual relations, it is sufficient to state a claim upon which relief can be granted.

g.      Count V

Defendants allege that State Farm abused civil process by using third-party, UM, and UIM cases as a pretext to manufacture evidence, utilizing the subpoena power to elicit testimony in a manner designed to manufacture a false claim of fraud against Defendants, and undertaking "mad dog" defense tactics to increase litigation costs in order to intimidate Defendants and other medical providers. Am. Countercl. ¶¶ 139-142. "[T]o establish a claim for abuse of process under the law of Pennsylvania, it must be shown that the defendant (1) used a legal process

against the plaintiff; (2) primarily to accomplish a purpose for which the process was not designed, and (3) that harm was caused to the plaintiff as a result." Keim v. Cty. of Bucks, 275 F. Supp. 2d 628, 635 (E.D. Pa. 2003) (citing Werner v. Plater-Zyberk, 799 A.2d 776, 785 (Pa. Super Ct. 2002)). "Abuse of process is, in essence, the use of legal process as a tactical weapon to coerce a desired result that is not the legitimate object of the process." Werner, 799 A.2d at 785.

Plaintiff contends that Defendants' counterclaim presents solely conclusory allegations, and fails to identify any specific litigation matter where the alleged abuse of legal process acts occurred. Pls.' Mot. Dismiss 34-37. On a motion to dismiss, the Court must take the factual allegations as true and resolve all inferences in favor of the non-moving party, here the Defendants. Defendants' counterclaim contains copious allegations related to State Farm's use of process for the purpose of harming Defendants and lowering insurance costs, and points to the Plaintiffs' voluntary disclosures as listing the litigations in which civil process was abused. The Court does not examine the truth of these factual allegations at the motion to dismiss stage. Therefore, Count V states a plausible claim for abuse of process.

> h. Count VI

Defendants allege a civil conspiracy between State Farm and its various counsel[6] to abuse civil process. "In Pennsylvania, 'to state a cause of action for civil conspiracy, the following elements are required: (1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; (2) an overt act done in pursuance of the common purpose; and (3) actual legal damage.'" Gen. Refractories Co., 337 F.3d at 313 (quoting Strickland v. Univ. of Scranton, 700 A.2d 979, 987-

---

[6] Specifically, Goldberg, Miller & Rubin; Bennett, Bricklin & Saltzurg; Britt, Hankins & Moughan; Dion, Rosenau & Smith; and Harrington & Associates.

88 (Pa. Super. Ct. 1997)). As previously discussed in relation to Defendants' antitrust claim, <u>see</u> supra pp. 8-11, Defendants have not stated facts raising a plausible inference that the law firms at issue were acting outside the scope of their representation, and for their own benefit. As such, they are considered to be agents of State Farm, with whom State Farm cannot legally conspire. <u>See</u> <u>Gen. Refractories Co.</u>, 337 F.3d at 313-14.

IV.     Conclusion

For all the foregoing reasons, it is hereby ORDERED that Plaintiffs' Motion to Dismiss (Doc. No. 31) is GRANTED in part, DENIED in part. Counts I, II, III, and VI are DISMISSED from Defendants' amended counterclaim (Doc. No. 20).


BY THE COURT:

/s/ Legrome D. Davis

Legrome D. Davis, J.